**JOHNSON FISTEL, LLP**
Frank J. Johnson (SBN 174882)
FrankJ@johnsonfistel.com
Brett M. Middleton (SBN 199427)
BrettM@johnsonfistel.com
Kristen O'Connor (SBN 305113)
kristeno@johnsonfistel.com
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILLIP BERRY, derivatively on behalf of CV SCIENCES, INC. formerly known as CANNAVEST CORP. <br><br> Plaintiff, <br><br> v. <br><br> JOSEPH DOWLING, MICHAEL MONA, III, MICHAEL MONA, JR., JAMES MCNULTY, STEVEN M. SCHMITZ, GARY SLIGAR, BETH ALTMAN, PAUL BLAKE, TERRI FUNK GRAHAM, and JOSEPH MAROON, <br><br> Defendants, <br><br> CV SCIENCES, INC. formerly known as, CANNAVEST CORP., <br><br> Nominal Defendant. | Case No.: **'20 CV1072 JM   MDD** <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Phillip Berry ("Plaintiff"), by and through their undersigned counsel, bring this shareholder derivative action on behalf of Nominal Defendant CV Sciences, Inc. ("CV Sciences" or the "Company") against certain current and/or former officers and directors of the Company for violations of law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and for contribution for violations of the federal securities law.  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by CV Sciences and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on CV Science's website concerning the Company's public statements; (d) publicly available pleadings, papers, and court documents, including any documents filed with and publicly available from the related pending securities fraud class action, *In Re: CV Sciences, Inc. Securities Litigation*, Case 2:18-cv-01602-JAD-BNW (D. Nev.) (the "Securities Class Action"); and (e) review of other publicly available information concerning CV Sciences, the Individual Defendants, and the Wrongful Refusal Defendants (defined below).

## I.   NATURE AND SUMMARY OF THE ACTION

1.     CV Sciences is California-based life science company and self-lauded "pioneer" of the hemp and cannabidiol ("CBD") industry.  The Company operates through two distinct business segments: (i) a consumer product division focused on manufacturing, marketing, and selling plant-based CBD products to a range of market sectors; and (ii) a drug development division focused on developing and commercializing CBD-based novel therapeutics.

2.     Beginning from at least June 19, 2017 and continuing through the present (the "Relevant Period"), CV Sciences' leading pharmaceutical candidate was CVSI-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

007.  A CBD and nicotine combination therapy, CVSI-007 was designed to support the cessation of smokeless tobacco addiction and is the only product in the Company's clinical pipeline to date.

3.      According to the Company, the worldwide market for smokeless tobacco addiction is estimated at over $5 billion.  During the Relevant Period, the Company endeavored to capitalize on this multibillion dollar trend through:  (i) procurement of a patent on CVSI-007 with the US Patent and Trademark Office ("USPTO"); and (ii) preparation of an Investigational New Drug ("IND") application for CVSI-007 for submission to the U.S. Food and Drug Administration ("FDA").  These parallel regulatory efforts, if successful, would ensure CVSI-007's commercial viability as critical prerequisites to market entry.

4.      On May 16, 2016, the Company filed a provisional patent application[1], number 62/336,990, for CVSI-007 with the USPTO entitled "Pharmaceutical Formulations Containing Cannabidiol and Nicotine for Treating Smokeless Tobacco Addiction."  On February 7, 2017, the Company filed a continuing patent application under the same title, number 15/426,617.

5.      But on April 27, 2017—unbeknownst to the investing public—the USPTO rejected the patent application for CVSI-007 because it was an "obvious" invention and therefore deemed "unpatentable."  On December 14, 2017, the USPTO affirmed its rejection when it issued a final rejection of CVSI-007's patent application.

6.      Yet, notwithstanding that the USPTO had twice rejected a patent on the Company's core drug, the Individual Defendants continued to stoke investor excitement by characterizing CVSI-007 as "*patent-pending*," "*proprietary*," and "*patent-protectable*."  These statements were false and misleading because they

---

[1] "A provisional application provides the means to establish an early effective filing date in a later filed nonprovisional patent application." *See* https://www.uspto.gov/patents-getting-started/patent-basics/types-patent-applications/provisional-application-patent.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

omitted, altogether, the material adverse fact that the patent application had been rejected and failed to disclose any responses or actions taken by the Company in connection with the USPTO's rejections. In so doing, investors were misled as to the true status and commercial viability of CVSI-007, which operated as a critical growth channel for the Company in a much-touted "multibillion"-dollar market.

7. The truth began to emerge at on August 20, 2018 when Citron Research reported the USPTO's rejections. On this news, CV Sciences' share price plunged from a high of $9.20 per share to close at $4.21 per share that same day. This was an intraday decline of $4.99 per share, or 54.24%.

8. The misconduct of the Individual Defendants in causing the Company to issue false and misleading statements to the investing public and omit material information concerning the Company's business, operations, and financial prospects as a result of having caused the Company to overstate the commercial viability for its core drug has resulted in the filing of the Securities Class Action against the Company, its former President and CEO, Defendant Mona, Jr., its former COO, Defendant Mona III, and its present CEO, Dowling.

9. On April 22, 2020, Plaintiff made a written demand (the "Demand") on CV Sciences' board of directors (the "Board") to investigate and take the necessary legal action against those responsible for the damages the Company has suffered as set forth in the Demand and in the Securities Class Action. In response to the Demand, Plaintiff's counsel received a letter dated May 4, 2020 (the "May 4 Letter"), from S. Todd Neal of the law firm Procopio, Cory, Hargreaves & Savitch LLP ("Procopio"), on behalf of the Company. The May 4 Letter advised that the Board had authorized Mr. Neal to respond on its behalf and summarily refused to take further action in response to the Demand.

10. The Board's purported investigation and response to the Demand was wrongful and unreasonable under Delaware law. The Board has failed to act

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  independently, in good faith, and within the realm of sound business judgment in

2  investigating and denying the Demand.

3      11.   In response to the Board's unreasonable and wrongful refusal of

4  Plaintiff's Demand to disinterestedly and independently investigate and remediate

5  harms caused to the Company, Plaintiff has filed this action alleging breaches of

6  fiduciary duties, waste of corporate assets, unjust enrichment, and for contribution for

7  violations of the federal securities law.  Because the Board's response to the Demand

8  was improper and directly at odds with the Board's fiduciary duties, as detailed further

9  herein, this derivative action should be permitted to proceed for the benefit of the

10 Company and its shareholders.

11 **II.   JURISDICTION AND VENUE**

12      12.   This Court has jurisdiction over the claims asserted herein under

13 28 U.S.C. § 1332 because there is complete diversity among the parties and the

14 amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

15      13.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that this

16 action states more than one federal question.  Plaintiff has asserted a federal claim for

17 contribution derivatively on behalf of the Company, arising under Sections 10(b) and

18 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-

19 4.   Pursuant to federal statutory law, this Court has original federal question

20 jurisdiction over the federal contribution claim.

21      14.   This Court has supplemental jurisdiction over the remaining claims under

22 28 U.S.C. § 1367.

23      15.   This action is not a collusive action designed to confer jurisdiction on a

24 court of the United States that it would not otherwise have.

25      16.   This Court has personal jurisdiction over each defendant because each

26 defendant is either a corporation conducting business and maintaining operations in

27 this District or is an individual who is either present in this District for jurisdictional

28 purposes or has, directly and indirectly, used the means and instrumentalities of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b), (c), and (d).  CV Sciences maintains its headquarters in San Diego, California, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    THE PARTIES

### Plaintiff

18.     Plaintiff is a current shareholder of CV Sciences.  Plaintiff has continuously held CV Sciences common stock at all relevant times.  Plaintiff is a citizen of Virginia.

### Nominal Defendant CV Sciences

19.     Nominal Defendant CV Sciences is incorporated under the laws of the State of Delaware and has its principal executive offices located in San Diego, California.  CV Sciences' stock trades on the OTCQB Marketplace ("OTCQB") under the symbol "CVSI."[2]   The Company operates two distinct business segments: a

---

[2] The Company's stock formerly traded on the OTC bulletin board market under the symbol "CANV."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  consumer product division focused on manufacturing, marketing, and selling plant-
2  based CBD products to a range of market sectors; and a drug development division
3  focused on developing and commercializing CBD-based novel therapeutics utilizing
4  CBD.  As of May 6, 2020, the Company had approximately 99.85 million shares
5  outstanding.

6      20.   Defendant Joseph Dowling ("Dowling") served as the Company's CFO
7  and Secretary from June 2014 until March 2019 and has served as the Company's
8  CEO and a member of the Board of Directors since May 31, 2018.  Dowling is a
9  defendant in the Securities Class Action.  Dowling received $634,492 in total
10  compensation from the Company in 2017, $748,959 in total compensation from the
11  Company in 2018 and $2,766,471 in total compensation from the Company
12  in 2019.  During the Relevant Period, 250,000 shares of Company stock were slated
13  to vest for Dowling if the Company received "final meeting minutes from a pre-
14  investigational new drug application ('IND') meeting as authorized by the FDA for a
15  drug development program utilizing Cannabidiol ('CBD') as the active
16  pharmaceutical ingredient."  Defendant Dowling is a citizen of the State of California.

17      21.   Defendant Michael Mona, III ("Mona, III") served as the Company's
18  COO and as a Director from 2016 until 2020, and was the Company's President from
19  May 31, 2018 until January 2019.  Mona, III is a defendant in the Securities Class
20  Action.  Mona, III received $705,514 in total compensation from the Company in
21  2017, $671,752 in total compensation from the Company in 2018, and $1,540,121 in
22  total compensation from the Company in 2019.  During the Relevant Period,
23  250,000 shares of Company stock were slated to vest for Mona, III if the Company
24  received "final meeting minutes from a pre-investigational new drug application
25  ('IND') meeting as authorized by the FDA for a drug development program utilizing
26  Cannabidiol ('CBD') as the active pharmaceutical ingredient."  Defendant Mona, III
27  is a citizen of the State of California.
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

22.     Defendant Michael Mona, Jr. ("Mona Jr.") served as the Company's President and CEO from 2012, and as a member of the Board of Directors from 2013, until he resigned globally on May 31, 2018.  His resignation was precipitated by a consent judgment with the SEC, which effected a five-year bar on Defendant Mona Jr. serving as an officer or director of a publicly traded company.  In addition to being charged with securities fraud by the SEC for filing false financial reports in his capacity as CannaVest's President and CEO, over the course of the last two decades, Mona, Jr. was also denied a casino license application by the Nevada Gaming Control Board for accounting irregularities and ordered to pay approximately $17.8 million in damages for intentional fraud.  Mona Jr. received $1,467,779 in total compensation from the Company in 2017, and $7,227,562 in total compensation from the Company in 2018.  Mona Jr. is a defendant in the Securities Class Action.  On June 8, 2018 (just eight days following his resignation from all director and officer positions), the Company and Mona Jr. entered into an employment agreement whereunder Mona Jr. would occupy the role of "Founder Emeritus" and report to the CEO.  Under the agreement, Defendant Mona Jr. was entitled to a base salary of $400,000 (*i.e.* a $70,000 raise in annual salary) and other miscellaneous benefits, including a $1,500 per month car allowance.  During the Relevant Period, 1.25 million shares of Company stock were slated to vest for Dowling if the Company received "final meeting minutes from a pre-investigational new drug application ('IND') meeting as authorized by the FDA for a drug development program utilizing Cannabidiol ('CBD') as the active pharmaceutical ingredient."  Defendant Mona Jr. is a citizen of the State of Nevada.

23.     Defendant James McNulty ("McNulty") has served as a Company director since January 2016.  McNulty received $26,316 in total compensation from the Company in 2017, $131,839 in total compensation from the Company in 2018, and $120,000 in total compensation from the Company in 2019.  During the Relevant

1   Period, McNulty served on and was chair of the Audit Committee. Defendant

2   McNulty is a citizen of Florida.

3        24.   Defendant Steven M. Schmitz ("Schmitz") served as a Company director

4   from May 2017 until April 2018. Defendant Schmitz received $26,594 in total

5   compensation from the Company in 2017, and $24,339 in total compensation from

6   the Company in 2018. Defendant Schmitz is a citizen of Massachusetts.

7        25.   Defendant Gary Sligar ("Sligar") served as a Company director from

8   June 2016 until June 2019. Defendant Sligar received $43,296 in total compensation

9   from the Company in 2017, $61,839 in total compensation from the Company in 2018,

10   and $25,000 in total compensation from the Company in 2019. During the Relevant

11   Period, Sligar served on the Audit Committee. Defendant Sligar is a citizen of Florida.

12        26.   Defendant Beth Altman ("Altman") has served as a Company director

13   since October 2019. Defendant Altman received $225,737 in total compensation from

14   the Company in 2019. Defendant Altman has served on the Audit Committee

15   since 2019 and is a citizen of California.

16        27.   Defendant Paul Blake ("Blake") has served as a Company director since

17   October 2019. Defendant Blake received $220,428 in total compensation from the

18   Company in 2019. Defendant Blake is a citizen of Pennsylvania.

19        28.   Defendant Terri Funk Graham ("Graham") has served as a Company

20   director since August 2019. Defendant Graham received $225,548 in total

21   compensation from the Company in 2019. Defendant Graham is a citizen of

22   California.

23        29.   Defendant Joseph Maroon ("Maroon") has served as a Company director

24   since August 2018. Defendant Maroon received $1,000,381 in total compensation

25   from the Company in 2018 and $50,000 in total compensation from the Company

26   in 2019. Defendant Maroon has served on the Audit Committee since 2018 and is a

27   citizen of Pennsylvania.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

30.     Defendants identified in ¶¶ 20–25 are sometimes referred to herein as the "Individual Defendants."

31.     Defendants identified in ¶¶ 23, 25–26, 29 are sometimes referred to herein as the "Audit Committee Defendants."

32.     Defendants identified in ¶¶ 20, 23, 26–29 are sometimes referred to herein as the "Wrongful Refusal Defendants."

33.     Defendants identified in ¶¶ 20, 21–22 are sometimes referred to herein as the "Officer Defendants" or the "Securities Class Action Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### Prerequisites to Commercial Viability of Pharmaceutical Products in the U.S.

34.     Pharmaceutical companies in the United States conventionally submit commercial drug candidates to both the USPTO and FDA for evaluation and approval. The USPTO approves patents that protect the drug's underlying invention, and the FDA must determine that a drug provides benefits that outweigh its known and potential risks for an intended population before it can be marketed.

35.     Although USPTO and FDA approvals are separate, but integral parts of the preclinical process, the initiation and success of the FDA approval process is often highly dependent on a drug's patent status.  Indeed, companies typically file a patent application before initiating the FDA approval process, to avoid the risk of another company patenting the invention first.  Such a scenario could be catastrophic for an innovating company, as it could be forced to either have to license the drug from the other company or abandon the FDA process altogether.

36.     The USPTO grants patents to inventions that are novel, useful, and nonobvious.  The obviousness requirement forecloses patent protection for products or processes that rely on non-integral modifications of "prior art," or already-existing products or processes.

**The Company**

37.     CV Sciences, formerly known as CannaVest Corporation, is a Delaware life sciences corporation headquartered in San Diego, California.  Its stock trades on the OTCQB under the ticker symbol "CVSI."

38.     The Company operates two distinct business segments: (i) a consumer product division focused on manufacturing, marketing, and selling plant-based CBD products to a range of market sectors; and (ii) a drug development division focused on developing and commercializing CBD-based novel therapeutics utilizing CBD.

39.     In January 2016, the Company announced its acquisition of CanX Inc., a Florida-based specialty pharmaceutical company, in conjunction with a pivot in the Company's strategic focus from leading the market of hemp-derived CBD oil products into an expansive pharmaceutical company focused on the development and commercialization of innovative medicines.   In a letter to shareholders dated September 19, 2016, then-President and CEO Mona, Jr. explained:

> Given our already established position as a market leader in CBD consumer products, ***the shift in our corporate strategy to include drug development was a critical move because it positioned CV Sciences as a life science company, addressed sizeable multi-billion dollar markets and expanded our potential to increase shareholder value***.

In furtherance of the Company's new focus on drug development, CV Sciences created a pharmaceutical division responsible for, *inter alia*, developing and commercializing novel therapeutics utilizing synthetic CBD to treat smokeless tobacco (e.g. chewing tobacco) use and addiction.

40.     On September 22, 2016, Mona, Jr. touted smokeless tobacco treatment as a multibillion-dollar market opportunity for the Company, noting:

> Nicotine is the largest drug addiction problem worldwide and represents a significant opportunity to develop an effective treatment for this addiction.  According to Statista, there was approximately $5.3 billion in retail sales of smokeless tobacco products in 2014, and approximately 1.3 billion units of smokeless tobacco products were sold during that time.  ***Smokeless tobacco addiction is an unmet need that addresses a massive market opportunity, and we believe that our initial drug candidate to treat smokeless tobacco addiction will dramatically improve patient outcomes for millions***.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

\*   \*   \*

Given that there are no FDA-approved drugs to treat smokeless tobacco addiction and that the FDA has approved numerous nicotine replacement therapy drugs (NRTs), we believe that our drug candidate will be extremely well-received in the market.

41.     To capitalize on this "massive market opportunity," the Company tasked its pharmaceutical division with a principal objective: development of its lead pharmaceutical product, CVSI-007.  CVSI-007 is a chewing gum containing nicotine and synthetic CBD designed to support cessation of smokeless tobacco use and addiction.

42.     On May 16, 2016, the Individual Defendants caused the Company to file provisional patent application number 62/336,990, entitled "Pharmaceutical Formulations Containing Cannabidiol And Nicotine For Treating Smokeless Tobacco Addiction," with the USPTO for CVSI-007.

43.     Thereafter, on September 22, 2016, the Individual Defendants caused CV Sciences to file a Form 8-K with the SEC announcing the Company's much-trumpeted "[p]ivot into drug development *to address a $5.3 billion market opportunity*."  A copy of a shareholder letter issued by the Company was attached.  In the letter, which was signed by Mona, Jr., the Company relayed the specific details and status of the Company's patent application, noting *"[w]e have a patent pending on the technology[.]"*

44.     The shareholder letter further relayed that the Company had filed an initial, provisional patent in 2016 and assured investors that the Company would keep them "*updated on all the latest developments as we plan on commencing our human studies in 2017*."

45.     On February 7, 2017, the Company filed a continuing patent application, number 15/426,617, with the USPTO under the same title.

46.     Yet, notwithstanding Mona, Jr.'s personal guarantee that investors would be kept apprised of "*all the latest developments*" concerning CVSI-007's preclinical

11

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

progress, during the Relevant Period, the Individual Defendants caused CV Sciences to make improper statements by actively concealing the true status of its patent application—including the USPTO's final rejection of the patent—from the investing public.  These problems, as the Individual Defendants were well aware, would affect sales and revenue-growth projections by overstating CVSI-007's commercial and regulatory viability, making the Company's public statements false and misleading.

**The Individual Defendants Caused CV Sciences to Make False and Misleading Statements During the Relevant Period**

47.    On April 27, 2017, the USPTO rejected the Company's CVSI-007 patent application because it was deemed "obvious" (the "First Rejection").  On June 6, 2017, the USPTO mailed and emailed the Company a letter relaying its decision and the official status change of the patent to "non-final rejection," citing that CVSI-007 was "unpatentable" because "it [was] apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention."

48.    Despite knowing that the USPTO had issued the First Rejection, on June 19, 2017, the Individual Defendants caused the Company to issue a press release announcing the Company's "plan for CVSI-007, the Company's ***patent-pending*** product for smokeless tobacco addiction therapy consisting of nicotine-polacrilex chewing gum in combination with synthetic cannabidiol (CBD)."  Mona, Jr. noted that CVSI-007 was based on the Company's "***own proprietary research***" and failed to disclose the USPTO's First Rejection to investors.

49.    On August 11, 2017, Defendants submitted a formal response to the First Rejection.  On August 23, 2017 and again on August 30, 2017, Defendants initiated telephonic interviews with the USPTO relating to CVSI-007's application.  Defendants did not disclose the interviews to investors.

50.    On the same day, the Individual Defendants caused CV Sciences to file a Form 10-Q with the SEC, which reported the Company's financial results Q2 2017 (the "August 2017 10-Q").    The August 2017 10-Q stated: "Our specialty

12

pharmaceutical business segment is developing synthetic cannabinoids to treat a range of medical conditions.  The Company's product candidates are based on ***proprietary formulations***, processes and technology that ***we believe are patent-protectable***, and we plan to vigorously pursue patent protection on the Company's two drug candidates."   Despite characterizing CVSI-007 as "proprietary" and "patent-protectable," the August 2017 10-Q failed to disclose the USPTO's First Rejection or any actions taken by the Company in response thereto.

51.     Notably, the August 2017 10-Q contained certifications, pursuant to the Sarbanes-Oxley Act of 2001 ("SOX") signed by Mona, Jr., in his capacity as President and CEO, and Defendant Dowling, in his capacity as Chief Financial Officer.  The SOX certification stated that the August 2017 10-Q "(1) the Report, as filed with the Securities and Exchange Commission, fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant." Defendants Mona, Jr. and Dowling each signed a separate certification stating, in relevant part:

1.  I have reviewed this Quarterly Report on Form 10-Q of the Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known

to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

52.    On September 12, 2017, the Individual Defendants caused CV Sciences to host a shareholder update conference call in order to provide investors with "highlights of the Company's latest updates and accomplishments during 2017 and strategic initiatives . . . ." The Individual Defendants caused the Company to publish materials in connection with the presentation, a copy of which was attached as an exhibit to the Company's filed with the SEC on September 14, 2017. The materials were signed by Mona, Jr and included a PowerPoint presentation that touted, once again, the Company's "***proprietary technology***" for its "***patent pending***" drug

1  candidate.  Here again, the Individual Defendants failed to disclose the USPTO's First
2  Rejection or any actions taken by the Company in response thereto.

3       53.    On November 8, 2017, the Individual Defendants caused CV Sciences to
4  host an earnings conference call with analysts and investors to discuss the Company's
5  financial results, operations, and guidance.  During the earnings call, Dowling stated:

6         Just a couple more slides and then we'll have Q&A.  A few brief
7         comments on our drug development operating segment.  This slide
       provides a bullet point summary of our drug development program for
8         CVSI-007, our lead drug candidate.  Our development program is a
       combination therapy utilizing cannabidiol and nicotine for the medical
9         indication of treating smokeless tobacco use and addiction.  **We have**
       **patent pending technology and we fully expect this will be developed**
10        **under 505(b)(2)** and accelerated approval pathway under the Federal
       Food, Drug, and Cosmetic Act.

11      54.    In conjunction with the earnings call, Dowling presented a series of
12 PowerPoint slides that, once again, touted the Company's "**proprietary technology**"
13 for its "**patent pending**" drug candidate.

14      55.    On November 8, 2017, the Individual Defendants caused CV Sciences to
15 file a Form 10-Q with the SEC, which reported the Company's financial results Q3
16 2017 (the "November 2017 10-Q").  The November 2017 10-Q stated: "Our specialty
17 pharmaceutical business segment is developing synthetic cannabinoids to treat a range
18 of medical conditions.  The Company's product candidates are based on **proprietary**
19 **formulations**, processes and technology that **we believe are patent-protectable**, and
20 we plan to vigorously pursue patent protection on the Company's two drug
21 candidates."   Despite characterizing CVSI-007 as "proprietary" and "patent-
22 protectable," the November 2017 10-Q failed to disclose the USPTO's First Rejection
23 or any actions taken by the Company in response thereto.

24      56.    The November 2017 10-Q also contained certifications, pursuant to the
25 Sarbanes-Oxley Act of 2001 ("SOX") signed by Mona, Jr., in his capacity as President
26 and CEO, and Defendant Dowling, in his capacity as Chief Financial Officer.  The
27 SOX certification stated that the August 2017 10-Q "(1) the Report, as filed with the
28 Securities and Exchange Commission, fully complies with the requirements of section

15
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant." Defendants Mona, Jr. and Dowling each signed a separate certification stating, in relevant part:

1.  I have reviewed this Quarterly Report on Form 10-Q of the Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

57.     On December 14, 2017, the USPTO issued a "final rejection" of the Company's CVSI-007 patent application because the agency reached a final conclusion that the invention was "obvious" (the "Final Rejection").     On December 20, 2017, the USPTO mailed and emailed the Company a letter relaying its decision and the official status change of the patent to a "final rejection," citing 35 U.S.C. § 103 as the basis for its determination that CVSI-007 was unpatentable:

A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102 of this title, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.

The USPTO further acknowledged its receipt of Defendants' formal response to the First Rejection, and that it had determined it did not "consider [Defendants' response] persuasive."  In plain contrast to the Individual Defendants' assurances and Mona Jr's personal guarantee that investors would be kept apprised of "***all of the latest developments***" concerning CVSI-007's preclinical progress, the Individual Defendants ***did not relay the Final Rejection to the Company's shareholders***.

58.     On January 23, 2018, the Company filed a notice of appeal to the Patent Trial and Appeal Board.  The Individuals Defendants ***concealed this action from investors***.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

59.     On March 29, 2018, the Individual Defendants caused CV Sciences to host an earnings conference call with analysts and investors to discuss the Company's financial results, operations, and guidance.   During the earnings call, Dowling continued to describe CVSI-007's status as "patent pending," while failing to disclose the First Rejection, the Final Rejection, or any responses by Defendants taken thereto:

> ***Our drug development segment continues to execute on our development plan to develop the only FDA-approved drug to treat smokeless tobacco use and addiction***.  We are a life science company, dedicated to the advancement of science, health and well-being and education and safety for our customers and patients in both our consumer product and drug development operating segments.
>
> *          *          *
>
> So now, just a few words about our drug development division and then the presentation will be finished.   This slide provides a bullet point summary of our drug development program for CVSI-007, our lead drug candidate.   Our development program is a combination therapy utilizing cannabidiol and nicotine for the medical indication of treating smokeless tobacco use and addiction.   We have ***patent pending technology*** and ***we fully expect this will be developed under a 505(b)(2) accelerated drug approval pathway***.

60.     In conjunction with the earnings call, Dowling presented a series of PowerPoint slides that, once again, touted the Company's "***proprietary technology***" for its "***patent pending***" drug candidate.

61.     On the same day, the Individual Defendants caused the Company to issue a press release announcing "***Strong Progress in Drug Development Division including preclinical progress with CVSI-007, the Company's patent pending synthetic-based cannabidiol[.]***"   The press release included a quote from Dowling indicating that "[o]n the drug development side, we continue to make steady progress in advancing CVSI-007 - ***our proprietary lead drug candidate - which addresses the multibillion dollar smokeless tobacco use and addiction market***."

62.     On March 30, 2018, the Individual Defendants caused CV Sciences to file its Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K").   Of CVSI-007's patent status, the 2017 10-K indicated:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The Company's ***first patent-pending product candidate, CVSI-007***, combines CBD and nicotine in treatment of smokeless tobacco use and addiction. . . . CVSI-007 is based on proprietary formulations, processes and technology that ***we believe are patent-protectable***.  In May 2016, we filed a patent application for these formulations and processes with the U.S. Patent and Trademark Office.

*     *     *

***We have a pending patent application for our product candidate CVSI-007 in the United States that will expire in 2036***.

Despite describing the patent application as "pending" and "protectable," the 2017 10-K failed to disclose the USPTO's First Rejection, the USPTO's Final Rejection, or any actions taken by the Company in response thereto.

63.     The 2017 10-K contained certifications pursuant to SOX that were signed by Defendants Mona, Jr. and Dowling, stating that the financial information contained in the 2017 10-K was accurate and disclosed all material changes to the Company's internal control over financial reporting.  In addition to being signed by Defendants Mona, Jr. and Dowling, the 2017 10-K was signed by Director Defendants Mona, III, McNulty, Sligar, and Schmitz.  Defendants Mona, Jr. and Dowling, in their capacities as CV Sciences' CEO and CFO, respectively, each signed a separate certification stating, in relevant part:

1. I have reviewed this Annual Report on Form 10-K of the Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our

19

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

64.   On May 14, 2018, the Individual Defendants caused CV Sciences to file a Form 10-Q with the SEC, which reported the Company's financial results Q1 2018 (the "May 2018 10-Q").  The May 2018 10-Q stated:

Our specialty pharmaceutical business segment is developing synthetic cannabinoids to treat a range of medical conditions.  The Company's product candidates are based on ***proprietary formulations***, processes and technology that we believe are ***patent-protectable***, and we plan to vigorously pursue patent protection on the Company's two drug candidates.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

65.   The May 2018 10-Q contained certifications, pursuant to SOX and signed by Mona, Jr., in his capacity as President and CEO, and Defendant Dowling, in his capacity as Chief Financial Officer.   The SOX certification stated that the May 2018 10-Q "(1) the Report, as filed with the Securities and Exchange Commission, fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant."   Defendants Mona, Jr. and Dowling each signed a separate certification stating, in relevant part:

1.  I have reviewed this Quarterly Report on Form 10-Q of the Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and

21

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

66.    On May 15, 2018, the Individual Defendants caused the Company to issue a press release continuing to stoke investor confidence about the Company's "patent pending" drug, announcing "Continued Progress in Drug Development Division (original emphasis omitted) including preclinical progress with CVSI-007, the Company's **patent pending synthetic-based cannabidiol**, which will be co-administered with nicotine to provide treatment options for smokeless tobacco use and addiction, **currently a multibillion market with no currently FDA-approved drugs available to help patients**."  The press release included a quote by Dowling indicating that "[o]n the drug development side, we made steady progress in advancing CVSI-007 – our proprietary lead drug candidate - which addresses the multibillion dollar smokeless tobacco use and addiction market."

67.    That same day, the Individual Defendants caused the Company to host an earnings conference call with analysts and investors to discuss the Company's financial results, operations, and guidance.  During the earnings call, Dowling stated: "Our drug development segment **continues to execute on our plan** to develop the only

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

FDA approved drug to treat smokeless tobacco use and addiction. . . .  CVSI believes strongly in the potential of our drug development program for the massive unmet need of treating nicotine use and addiction, a *multibillion-dollar market*."

68.     On June 26, 2018, the Individual Defendants caused CV Sciences to file a Form 8-K with the SEC attaching a shareholder letter from Dowling.  In the letter, Dowling continued to pump CVSI-007's patent status, noting that "Our *proprietary patent-pending drug candidate (CVSI-007)* combines synthetic CBD and nicotine and has the potential to effectively treat smokeless tobacco addiction.  *This treatment market has been estimated at greater than $2 billion* and provides *another important growth channel for our Company*."

69.     On August 1, 2018, the Individual Defendants caused CV Sciences to file a Form 10-Q with the SEC, which reported the Company's financial results for Q2 2018 (the "August 2018 10-Q").  The August 2018 10-Q stated: "Our specialty pharmaceutical business segment is developing synthetic cannabinoids to treat a range of medical conditions.  The Company's product candidates are based on *proprietary formulations*, processes and technology that *we believe are patent-protectable*, and we plan to vigorously pursue patent protection on the Company's two drug candidates."  Once again, despite characterizing CVSI-007 as "proprietary" and "patent-protectable," the August 2018 10-Q failed to disclose the USPTO's First Rejection, the USPTO's Final Rejection, or any actions taken by the Company in response thereto.

70.     The August 2018 10-Q contained a certification, pursuant to SOX and signed by Defendant Dowling, in his capacity as Chief Financial Officer.  The SOX certification stated that the August 2018 10-Q "(1) the Report, as filed with the Securities and Exchange Commission, fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition

and results of operations of the Registrant." Defendant Dowling signed a certification stating, in relevant part:

1. I have reviewed this Quarterly Report on Form 10-Q of the Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under my supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to me by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under my supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report my conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

71.     On August 1, 2018, the Individual Defendants caused the Company to issue a press release reporting its financial and operating results for Q2 2018.  The press release again stoked investor confidence about the Company's "patent pending" drug, announcing "Continued Progress in Drug Development Division (original emphasis omitted) including preclinical progress with CVSI-007, the Company's ***patent-pending synthetic-based cannabidiol***, which will be co-administered with nicotine to provide treatment options for smokeless tobacco use and addiction, ***currently a multibillion-dollar market with no currently FDA-approved drugs available to help patients***."  The press release included a quote by Dowling indicating that "[o]ur drug development program is making steady progress in advancing our proprietary lead drug candidate - CVSI-007 - which addresses the multibillion dollar smokeless tobacco use and addiction market."

72.     On a conference call with shareholders the same day, Dowling revealed that the Individual Defendants were totally apprised of CVSI-007's preclinical process, which he described as "very thoughtful" and undertaken "very carefully":

[W]e're not in a position to provide any further information than what we have done so far, but we are making progress on our preclinical program.

And for those that have experience in this area, ***it is a very thoughtful process and we are going through that process very carefully***.  We will provide updates as appropriate.

**Reasons the Individual Defendants' Statements Were Improper**

73.     The true facts, which were known or recklessly disregarded by the Individual Defendants during the Relevant Period but concealed from the investing public, were as follows:

25

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a.   The USPTO had issued its First Rejection of CVSI-007's patent application, rendering its commercial and regulatory viability significantly diminished;

b.   The USPTO had issued its Final Rejection of CVSI-007's patent application, rendering its commercial and regulatory viability significantly diminished;

c.   The Company lacked proprietary research as evidenced by the USPTO's First Rejection and Final Rejection deeming CVSI-007 "unpatentable" because it was an "obvious" invention;

d.   The Company lacked proprietary formulations, processes, and technology as evidenced by the USPTO's research as evidenced by the USPTO's First Rejection and Final Rejection deeming CVSI-007 "unpatentable" because it was an "obvious" invention;

e.   The Company's prospects for gaining market share in the "multibillion dollar smokeless tobacco use and addiction market" were grossly overstated given the significantly diminished likelihood that the Company would ever be able to obtain a patent and/or remain on a viable FDA approval pathway; and

f.   As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

74.   As a result of the Individual Defendants' false and misleading statements and omissions, CV Sciences shares traded at artificially inflated prices during the Relevant Period. Once the true facts regarding the Company's financial prospects and future business prospects began to emerge, the Company's stock price fell dramatically, erasing millions of dollars market capitalization.

**The Truth Emerges**

75.   The truth began to emerge on August 20, 2018 at 1:21 PM EST, when Citron Research published a Tweet exposing the USPTO's rejection of CV Sciences'

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

patent application for CVSI-007.  The Tweet stated: "$CVSI misrepresentation by management.  The total bull case is based on REJECTED patents the company has never disclosed and continues to hype."

76.    The market reacted swiftly, and investors shared the post broadly *via* Twitter.  In response to the foregoing revelations, CV Sciences' share price plummeted from an intraday high of $9.20 per share before the Tweet to close at $4.21 per share that same day.  This was a decline of $4.99 per share, or 54.24%.

77.    On August 29, 2018, Dowling confirmed the Individual Defendants' knowledge of the Final Rejection—concealed from investors until the information was revealed by Citron Research—when he defensively posited in a press release that "[a] 'final rejection' in the context of patent prosecution is anything but final."

**Duties of the Individual Defendants and Wrongful Refusal Defendants Fiduciary Duties**

78.    By reason of their positions as officers, directors, and/or fiduciaries of CV Sciences, and because of their ability to control the business and corporate affairs of CV Sciences, the Individual Defendants and Wrongful Refusal Defendants owed and owe the Company and its shareholders fiduciary obligations of care and loyalty, including the subsidiary duties of good faith, oversight, and disclosure, and were, and are, required to use their utmost ability to control and manage CV Sciences in a fair, just, honest, and an equitable manner.  The duty of care requires informed, deliberative decision-making based on all material information reasonably available.  The duty of loyalty requires acting (including deciding not to act) on a disinterested and independent basis, in good faith, with an honest belief that the action is in the best interests of the company and its shareholders.  The Individual Defendants and Wrongful Refusal Defendants were and are required to act in furtherance of the best interests of CV Sciences and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

27

79.     Each director and officer of the Company owes to CV Sciences and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

80.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of CV Sciences, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with CV Sciences, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

81.     Further, the Board, including the Wrongful Refusal Defendants, is and was required to act independently, in good faith, and within the realm of sound business judgment in considering and responding to the Demand.

82.     To discharge their duties, the officers and directors of CV Sciences, including the Individual Defendants, were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of CV Sciences were required to, among other things:

a.     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.     exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and complied with all applicable federal

and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.    when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**Duties Pursuant to the Audit Committee Charter**

83.    In addition to these duties, Board members who served on the Audit Committee owed specific duties to CV Sciences under the Amended Committee Charter (the "Audit Charter"). Specifically, they were and are mandated to:

[Provide] oversight of:

a) the integrity of the Company's financial statements and internal controls,

b) the Company's compliance with legal and regulatory requirements,

c) the independent registered public accounting firm's qualifications and independence and

d) the performance of the Company's internal audit function and the independent registered public accounting firm.

84.    The Audit Charter confers a number of responsibilities on the Audit Committee to oversee internal controls and risk management, including:

1. Select and retain (subject to approval by the Company's stockholders), evaluate and terminate when appropriate, the independent registered public accounting firm, set the independent registered public accounting firm's compensation, oversee the work of the independent registered public accounting firm and pre-approve all audit services to be provided by the independent registered public accounting firm.

2. Pre-approve all permitted non-audit services to be performed by the independent registered public accounting firm and establish policies and procedures for the engagement of the independent registered public accounting firm to provide permitted audit and non-audit services.

3. At least annually, receive and review: (a) a report by the independent registered public accounting firm describing the independent registered public accounting firm's internal quality-control procedures and any material issues raised by the most recent internal quality-control review, peer review or Public Company Accounting Oversight Board (PCAOB) review, of the independent auditing firm, or by any inquiry or investigation by governmental or professional authorities, within the

preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (b) other required reports from the independent registered public accounting firm.

4. At least annually, consider the independence of the independent registered public accounting firm, including whether the provision by the independent registered public accounting firm of permitted non-audit services is compatible with independence, and obtain and review a report from the independent registered public accounting firm describing all relationships between the firm and the Company.

5. Review with the independent registered public accounting firm:

      (a) the scope and results of the audit;

      (b) any problems or difficulties that the auditor encountered in the course of the audit work, and management's response; and

      (c) any questions, comments or suggestions the auditor may have relating to the internal controls, and accounting practices and procedures, of the Company or its subsidiaries.

6. Review, at least annually, the scope and results of the internal audit program (if applicable), including then current and future programs of the Company's Internal Audit Department (if applicable), and procedures for implementing accepted recommendations made by the independent registered public accounting firm.

7. Review with the independent registered public accounting firm and the Company's management: (a) the adequacy and effectiveness of the systems of internal controls (including any significant deficiencies and significant changes in internal controls reported to the Audit Committee by the independent registered public accounting firm or management), accounting practices, and disclosure controls and procedures (and management reports thereon), of the Company and its subsidiaries; and (b) current accounting trends and developments, and take such action with respect thereto as may be deemed appropriate.

8. Review with management and the independent registered public accounting firm the annual and quarterly financial statements of the Company, including: (a) any material changes in accounting principles or practices used in preparing the financial statements prior to the filing of a report on Form 10-K or 10-Q with the Securities and Exchange Commission; (b) disclosures relating to internal controls over financial reporting; (c) the items required by Statement of Auditing Standards 61 as in effect at that time in the case of the annual statements and Statement of Auditing Standards 100 as in effect at that time in the case of the quarterly statements; and (d) meet to review the Company's specific disclosures under "Management's Discussion and Analysis of Financial Conditions and Results of Operations" included in the Company's Form 10-K or 10-Q filed with the Securities and Exchange Commission.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

9.  Recommend to the Board of Directors, based on the review described in paragraphs 4 and 8 above, whether the financial statements should be included in the annual report on Form 10-K.

10.  Review earnings press releases, as well as Company policies with respect to earnings press releases, financial information and earnings guidance provided to analysts and rating agencies (this function may be performed by the Chair or the full Committee).

11.  Discuss Company policies with respect to risk assessment and risk management, and review contingent liabilities and risks that may be material to the Company and major legislative and regulatory developments which could materially impact the Company's contingent liabilities and risks.

12.  Review: (a) the status of compliance with laws, regulations, and internal procedures; and (b) the scope and status of systems designed to promote Company compliance with laws, regulations and internal procedures, through review of reports from management, legal counsel and third parties as determined by the Audit Committee.

13.  Establish procedures for the confidential and anonymous receipt, retention and treatment of complaints regarding the Company's accounting, internal controls and auditing matters, as well as for the confidential, anonymous submissions by Company employees of concerns regarding questionable accounting or auditing matters

14.  Establish policies for the hiring of employees and former employees of the independent registered public accounting firm.

15.  Obtain the advice and assistance, as appropriate, of independent counsel and other advisors as necessary to fulfill the responsibilities of the Audit Committee, and receive appropriate funding from the Company, as determined by the Audit Committee, for the payment of compensation to any such advisors.

16.  Conduct an annual performance evaluation of the Audit Committee and annually evaluate the adequacy of its charter.

85.    Upon information and belief, the Company maintained an Audit Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee, as those set forth above.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

86.    The Individual Defendants and Wrongful Refusal Defendants, as officers and/or directors of CV Sciences, were also bound by the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), which "establish[es] applicable policies,

31

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  guidelines, and procedures that promote ethical practices and conduct by CV Sciences
2  and all its employees, officers, and directors."

3      87.    In particular, the Code of Ethics mandates "honest and accurate recording
4  and reporting of information in order to make responsible business decisions.  This
5  includes such data as quality, safety, and personnel records, as well as financial
6  records.  All financial books, records and accounts must accurately reflect transactions
7  and events, and conform both to required accounting principles and to our system of
8  internal controls.  No false or artificial entries may be made."

9      88.    The Code of Ethics further mandates that all officers, directors and
10 employees of CV Sciences "must not take unfair advantage of. . .other parties by
11 means  of  manipulation;  concealment;  abuse  of  privileged  information;
12 misrepresentation of material facts; or any other unfair-dealing practice."

13     89.    Further, the Code of Ethics requires, in part, the following:

14     . . .[C]ompliance with the rules, standards and principles described in this
       Code. In addition, you should be alert to possible violations of the Code
15     by CV Sciences' employees, officers and directors, and you are expected
16     to report a violation promptly.

17     90.    Upon information and belief, the Company maintained a version of the
18 Code of Ethics during the Relevant Period that imposed the same, or substantially and
19 materially the same or similar, duties on the Individual Defendants and Wrongful
20 Refusal Defendants, as those set forth above.

21 **Control, Access, and Authority**

22     91.    The Individual Defendants, because of their positions of control and
23 authority as directors and/or officers of CV Sciences, were able to and did, directly
24 and/or indirectly, exercise control over the wrongful acts complained of herein, as well
25 as the contents of the various public statements issued by CV Sciences.

26     92.    Because of their advisory, executive, managerial, and directorial
27 positions with CV Sciences, each of the Individual Defendants had access to adverse,

28

32
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

non-public information about the financial condition, operations, and improper representations of CV Sciences.

93.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CV Sciences and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

94.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

b.     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.     properly and accurately guide investors and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

d.     remain informed as to how CV Sciences conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws;

e.     refrain from trading on material, adverse, non-public information; and

33
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

        f.     ensure that CV Sciences was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V. THE INDIVIDUAL DEFENDANTS' AND WRONGFUL REFUSAL DEFENDANTS' BREACHES OF THEIR DUTIES

95.    Each Individual Defendant and Wrongful Refusal Defendant, by virtue of his or her position as a director and/or officer, owed to CV Sciences and its shareholders the fiduciary duty of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of CV Sciences, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants and Wrongful Refusal Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CV Sciences, the absence of good faith on their part, and a reckless disregard for their duties to CV Sciences and its shareholders that the Individual Defendants and the Wrongful Refusal Defendants were aware, or should have been aware, posed a risk of serious injury to CV Sciences.

96.    The Individual Defendants each breached their duty of loyalty, including the subsidiary duties of good faith, oversight and disclosure, by issuing, or causing the Company to issue, false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

97.    The Wrongful Refusal Defendants violated their fiduciary duties by failing to act independently, in good faith, and within the realm of sound business judgment in considering and responding to the Demand.

## VI. CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

98.    In committing the wrongful acts alleged herein, the Individual Defendants and Wrongful Refusal Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with

34

one another in furtherance of their wrongdoing.  The Individual Defendants and Wrongful Refusal Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

99.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

100.  The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

101.  The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

102.  Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VII.  DAMAGES TO CV SCIENCES

103.   As a result of the Individual Defendants' wrongful conduct, CV Sciences disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated CV Sciences' credibility.  CV Sciences has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

104.   Further, as a direct and proximate result of the Defendants' conduct, CV Sciences has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

a.      costs incurred in investigating and defending CV Sciences and certain officers in the Securities Class Action;

b.      costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based, at least in part, on the Company's artificially inflated stock price; and

c.      costs incurred from the loss of the Company's customers' confidence in CV Sciences and its products.

105.  Moreover, these actions have irreparably damaged the Company's corporate image and goodwill.  For at least the foreseeable future, CV Sciences will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VIII.  DERIVATIVE AND DEMAND ALLEGATIONS

106.   Plaintiff brings this action derivatively, in the right and for the benefit of CV Sciences, to redress injuries suffered, and to be suffered, by CV Sciences as a direct result of the Individual Defendants' and the Wrongful Refusal Defendants' breaches of fiduciary duties and other violations of law.  CV Sciences is named as a nominal defendant solely in a derivative capacity.

36
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

107.   Plaintiff will adequately and fairly represent the interests of CV Sciences in enforcing and prosecuting its rights.

108.   Plaintiff is, and has continuously been, a shareholder of CV Sciences since prior to the start of the Relevant Period, and has been a shareholder at all relevant times, including at the time of the Individual Defendants' and Wrongful Refusal Defendants' wrongdoing complained of herein.

109.   As detailed below, Plaintiff's pre-suit Demand has been wrongfully refused by the Board, forcing Plaintiff to file this shareholder derivative action on behalf of the Company.

110.   Given the Board's wrongful, bad-faith, and unreasonable refusal of Plaintiff's lawful Demand to sufficiently investigate the misconduct, and/or to take sufficient action to remedy the harms caused to the Company, this shareholder derivative action should be permitted to proceed.

**Plaintiff's Demand Allegations**

111.   Before filing this derivative action, Plaintiff first demanded that the Board take action to investigate and redress the misconduct alleged herein. Specifically, on April 22, 2020, in accordance with Delaware law, Plaintiff issued the Demand on the Board to investigate, and if warranted, commence legal action against certain of the Company's current and former directors and executive officers who violated and caused the Company to violate the federal securities and applicable laws, *inter alia*, and who accordingly caused the damages the Company has suffered in connection with the events underlying the Securities Class Action.  A true and correct copy of the Demand is attached hereto as **Exhibit A**.

112.   In response to the Demand, Plaintiff's counsel received the May 4 Letter from S. Todd Neal of the law firm Procopio.  The May 4 Letter advised that "the Board is aware of your letter and [Mr. Neal was] authorized to respond on its behalf." A true and correct copy of the May 4 Letter is attached hereto as **Exhibit B**.

113.   The May 4 Letter made cursory reference to a Notice of Allowance issued by the USPTO and summarily stated that "[n]o further action w[ould] be taken in response to your [Demand]."

114.   The May 4 Letter failed to even address, much less confirm, that any investigation was actually conducted in response to the Demand, citing only the existence of pending litigation—including the Securities Class Action—and its intention to "zealously defend" pending and putative litigation.  The May 4 Letter further failed to provide any indicia that the Board had or would meaningfully investigate or address the accuracy of the Individual Defendants' myriad public statements alleged in the Demand, including the Individual Defendants' alleged breaches of their fiduciary duties to the Company.

115.   The Board failed to act independently, in good faith, and within the realm of sound business judgment when it decided to refuse the Demand.

116.   The Board has failed on every level in response to Plaintiff's Demand. The Board failed to meaningfully investigate or even address the accuracy of the Company's public disclosures, failed to engage in a meaningful and transparent process, and reached an inexplicable and unsupported [summary] conclusion.  As such, the Board's response to the Demand was improper and directly at odds with the Board's fiduciary duties.  Accordingly, this derivative action should proceed.

117.   The Board's failure to conduct a bona-fide and independent investigation into the allegations raised in the Demand regarding the Company's disclosure issues, along with its complete disregard of the actual merits of the claims set forth in the Demand and prejudgment of the merits of the claims set forth in the Demand, is improper and demonstrates the Board's lack of diligence and good faith.  The Board's abdication of its duty to investigate the centerpiece of the Demand (the accuracy of the Company's public disclosures, which ultimately resulted in the Securities Class Action) was not reasonable, was a decision made in bad faith, and is not entitled to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the protections of the business judgment rule and likewise warrants that this action proceed.

118.   CV Sciences has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Wrongful Refusal Defendants have not filed any lawsuits against any persons who were responsible for the wrongful conduct.  Thus, the Wrongful Refusal Defendants continue to breach their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches.

119.   If CV Sciences' current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case may contain provisions that eliminate coverage for any action brought directly by CV Sciences against the Individual Defendants, known as the "insured versus insured exclusion."

120.   As a result, if the Wrongful Refusal Defendants were to sue any of themselves or certain of the officers of CV Sciences, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Wrongful Refusal Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

121.   Plaintiff has not made any demand on shareholders of CV Sciences to institute this action  since such demand would be a futile and useless act for the following reasons:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a.   CV Sciences is a publicly traded company with thousands of shareholders of record and at least hundreds of thousands of beneficial owners;

b.   Making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of CV Sciences' shareholders; and

c.   Making demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified  with any degree of certainty.

## IX.   CLAIMS FOR RELIEF

### COUNT I

### Breach of Fiduciary Duties
### (Against the Officer Defendants)

122.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.   The Officer Defendants owed fiduciary duties to CV Sciences and its shareholders.  By reason of their positions as fiduciaries to the Company, the Officer Defendants owed duties of good faith, loyalty, candor, and truthful disclosure.  The Officer Defendants also owed CV Sciences fiduciary duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law, which impose broad obligations on Defendants vis-a-vis the corporation and its individual shareholders.  In addition, the Officer Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Ethics, and principles that, had they been discharged in accordance with the Officer Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

124.   The Officer Defendants violated these fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions and

1   misrepresentations described herein.  The Officer Defendants were well aware of the

2   relevant disclosure laws, rules, and regulations.

3       125.   The Officer Defendants consciously breached their fiduciary duties and

4   violated their corporate responsibilities in at least the following ways: affirmatively

5   and repeatedly making and/or failing to correct improper statements in press releases,

6   SEC filings, conference calls, and other public statements, relating to, among other

7   things, CV Sciences' business, operations, and growth prospects; failing to ensure the

8   Company's compliance with relevant legal and regulatory requirements, including but

9   not limited to requirements imposed under state and federal securities laws; and/or

10  failing to implement and maintain adequate internal controls.

11      126.   As a direct and proximate result of the Officer Defendants' breaches of

12  their fiduciary obligations, CV Sciences has sustained significant damages.

13  Accordingly, the Officer Defendants are liable to the Company.

14      127.   Plaintiff, on behalf of CV Sciences, has no adequate remedy at law.

15                              **COUNT II**

16                        **Breach of Fiduciary Duties**
17                    **(Against the Individual Defendants)**

18      128.   Plaintiff incorporates by reference and realleges each and every

19  allegation contained above, as though fully set forth herein.

20      129.   The Individual Defendants owed and owe CV Sciences fiduciary

21  obligations.   By reason of their fiduciary relationships, the Individual Defendants

22  specifically owed and owe CV Sciences the highest obligation of good faith, fair

23  dealing, loyalty, and due care in the administration of the affairs of the Company,

24  including, without limitation, the oversight of the Company's compliance with state

25  and federal securities laws, rules, and regulations, as well as the duty of candor and

26  truthful disclosure with respect to their public statements.

27      130.   The Individual Defendants also owed and owe CV Sciences fiduciary

28  duties imposed and defined by the federal securities laws, rules, regulations, and

41
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

federal substantive corporate law, which impose broad obligations on Defendants vis-a-vis the corporation and its individual shareholders.  The Individual Defendants violated these fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.

131.  In addition, the Individual Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Ethics and the charters of various Board committees, and principles that, had they been discharged in accordance with the Individual Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

132.  Each Individual Defendant violated his or her fiduciary duties by consciously causing, or consciously failing to prevent the Company from engaging in, the improper acts complained of herein.

133.  The Individual Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

- Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;

- Affirmatively and repeatedly making or allowing to be made, and/or failing to correct, improper statements in Company press releases, SEC filings, and other public statements relating to, among other things, CV Sciences' business, operations, and prospects;

- Failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws;

- Awarding CV Sciences' senior executives lavish compensation packages despite their responsibility for the Company's willful misconduct; and

42

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- • Reappointing certain directors who had failed in their duties to the Audit Committee.

134. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CV Sciences has sustained significant damages. Accordingly, the Individual Defendants are liable to the Company.

135. Plaintiff, on behalf of CV Sciences, has no adequate remedy at law.

## COUNT III

### Breach of Fiduciary Duties
### (Against the Wrongful Refusal Defendants)

136. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137. The Wrongful Refusal Defendants owed and owe CV Sciences fiduciary obligations. By reason of their fiduciary relationships, the Wrongful Refusal Defendants specifically owed and owe CV Sciences the highest obligation of good faith, fair dealing, loyalty, and due care in the administration of the affairs of the Company.

138. The Wrongful Refusal Defendants violated these fiduciary duties by failing to act independently, in good faith, and within the realm of sound business judgment in considering and responding to the Demand.

139. As a direct and proximate result of the Wrongful Refusal Defendants' breaches of their fiduciary obligations, CV Sciences has sustained significant damages. Accordingly, the Wrongful Refusal Defendants are liable to the Company.

140. Plaintiff, on behalf of CV Sciences, has no adequate remedy at law.

## COUNT IV

### Waste of Corporate Assets
### (Against All Defendants)

141. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

43

142.   As a result of Defendants' misstatements and failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, CV Sciences is subject to the Securities Class Action. Defendants have caused CV Sciences to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

143.   As a result of their waste of corporate assets, Defendants are liable to the Company.

144.   Plaintiff, on behalf of CV Sciences, has no adequate remedy at law.

### COUNT V

**Unjust Enrichment**
**(Against All Defendants)**

145.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.   By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of CV Sciences.  Defendants were unjustly enriched as a result of the compensation and remuneration they received while breaching fiduciary duties owed to the Company.

147.   Plaintiff, as a shareholder and representative of CV Sciences, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

148.   Plaintiff, on behalf of CV Sciences, has no adequate remedy at law.

### COUNT VI

**Derivatively for Contribution Under Sections 10(B)**
**and 21D of the Exchange Act**
**(Against the Securities Class Action Defendants)**

149.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

44

150.   During the Relevant Period, CV Sciences and the Securities Class Action Defendants Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Relevant Period, did: (i) deceive the investing public, including Plaintiff and other shareholders, as alleged herein; and (ii) caused Plaintiff and other shareholders to purchase CV Sciences common stock at artificially inflated prices.

151.   The Securities Class Action Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for CV Sciences common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

152.   CV Sciences and the Securities Class Action Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

153.   During the Relevant Period, the Securities Class Action Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

154.   CV Sciences and the Securities Class Action Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  CV Sciences and the Securities Class Action Defendants engaged in this misconduct to conceal CV

Sciences' true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

155.   Plaintiff and the shareholders have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CV Sciences' common stock.   Plaintiff and other shareholders would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for CV Sciences' common stock had been artificially inflated by Defendants' fraudulent course of conduct.

156.   As a direct and proximate result of CV Sciences' and the Securities Class Action Defendants' wrongful conduct, Plaintiff and the other shareholders suffered damages in connection with their respective purchases of the Company's common stock during the Relevant Period.

157.   By virtue of the foregoing, CV Sciences and the Securities Class Action Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Finding that Defendants have breached their fiduciary duties to the Company, wasted corporate assets, were unjustly enriched, and violated the federal securities laws;

B.   Directing CV Sciences to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote on the following corporate governance proposals, actions, or policies:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- a proposal to strengthen the Company's accounting and disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and the public;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of CV Sciences to nominate three candidates for election to the Board;

- an accounting by the CV Sciences officers to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or resolution of the Securities Class Action, or any related or similar litigation;

- the termination, for cause, any Company employee responsible for the wrongdoing alleged herein, including its current CEO, Dowling;

- the return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties; and

- the payment of interest by CV Sciences officers, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct.

C.     Against each Defendant in favor of CV Sciences for the amount of damages sustained by CV Sciences, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

D.     Requiring Defendants to return to CV Sciences all compensation and remuneration of whatever kind paid to them by the Company during the time that they were in breach of their fiduciary duties;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    E.    Directing Defendants to establish, maintain, and fully fund effective

2 corporate governance and compliance programs to ensure that CV Sciences' directors,

3 officers, and employees do not engage in wrongful or illegal practices;

4    F.    Granting additional appropriate equitable and/or injunctive relief to

5 remedy Defendants' misconduct, as permitted by law;

6    G.    Awarding Plaintiff the costs and disbursements of this action, including

7 reasonable attorneys' and experts' fees and expenses; and

8    H.    Granting such other and further relief as this Court deems just and

9 equitable.

10 **XI.    DEMAND FOR JURY TRIAL**

11    Plaintiff demands a trial by jury as to all issues so triable.

12  Dated:  June 11, 2020                **JOHNSON FISTEL, LLP**

13                                       By:  */s/ Brett M. Middleton*

14                                       BRETT M. MIDDLETON

15                                       FRANK J. JOHNSON
                                         KRISTEN O'CONNOR
16                                       655 West Broadway, Suite 1400
                                         San Diego, CA 92101
17                                       Telephone: (619) 230-0063
                                         Facsimile: (619) 255-1856
18                                       BrettM@johnsonfistel.com
                                         FrankJ@johnsonfistel.com
19                                       kristeno@johnsonfistel.com

20                                       *Counsel for Plaintiff*

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# <u>VERIFICATION</u>

I, Phillip Berry, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: June 5, 2020

Phillip Berry